**FILED**

**September 18, 2018**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time: 8:17 A.M. EASTERN**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT KNOXVILLE

| | |
|---|---|
| **LANIE SALZWEDEL,**[1] ) | **Docket No. 2016-03-1299** |
| **Employee,** ) | |
| **v.** ) | |
| **CVS,** ) | **State File No. 16141-2016** |
| **Employer,** ) | |
| **and** ) | |
| **NEW HAMPSHIRE INSURANCE** ) | **Judge Pamela B. Johnson** |
| **COMPANY,** ) | |
| **Carrier.**[2] ) | |

## COMPENSATION HEARING ORDER

This matter came before the Court for a Compensation Hearing on August 21, 2018. The central legal issue is whether Lanie Salzwedel established by a preponderance of the evidence that she is permanently and totally disabled from her February 18, 2016 work injury. If not permanently and totally disabled, then the Court must determine the extent of Ms. Salzwedel's permanent disability and whether she proved entitlement to an initial compensation award, increased benefits, or extraordinary relief. For the reasons below, this Court holds that Ms. Salzwedel established by a preponderance of the evidence entitlement to extraordinary relief and awards her permanent partial disability benefits for 275 weeks and future medical care.

---

[1] The Petition for Benefit Determination listed the employee's name as "Lanie Salzwedle." Later filings change the spelling of her last name to "Salzwedel." The medical records introduced also used the latter spelling of her last name.

[2] Before the hearing, Ms. Salzwedel filed a Notice of Voluntary Nonsuit and Order of Voluntary Dismissal as to the Subsequent Injury Fund Only, which the Court entered on August 7, 2018.

1

## History of Claim
### *Stipulations*

The parties' stipulated facts are summarized as follows: Ms. Salzwedel is fifty-nine years old and completed the tenth grade. On February 18, 2016, she sustained injuries arising primarily out of and in the course and scope of her employment with CVS. CVS received timely notice of her injuries and provided her authorized medical care with Drs. Paul Brady for her left shoulder and elbow and Patrick Bolt for her cervical spine.

Dr. Brady diagnosed lateral epicondylitis and placed her at maximum medical improvement (MMI) on August 15. He assigned no permanent medical impairment or restrictions for the left elbow and shoulder. Dr. Bolt diagnosed a herniated disc at C4-5 and C5-6; left upper extremity radiculopathy; cervical stenosis at C4-5, C5-6, and C6-7; and neck pain. He placed her at MMI for her cervical complaints on December 14. The extent of permanent medical impairment and restrictions remain in dispute.

Ms. Salzwedel had no permanent restrictions before her injury. Her weekly compensation rate is $274.47.

### *Hearing Testimony*
### *Injury*

Ms. Salzwedel testified she previously worked in a bakery, cleaned homes, and worked at Dollar General as an assistant manager. She worked at CVS as a shift supervisor. While her lifting requirements varied at CVS, she lifted heavier items such as cases of drinks, cartons of milk, and laundry detergent.

On February 18, 2016, Ms. Salzwedel went into the CVS stockroom to retrieve vitamins for a customer when she tripped over a box and fell onto her left side. When her shift ended, she went to the emergency room due to pain in her neck, ribs, head, and left arm and shoulder. She returned to work her next shift and continued working through December 3.

Ms. Salzwedel testified that she suffered prior injuries and/or pre-existing conditions.[3] In 1990, she experienced whiplash from a car accident. However, she denied permanent injury and testified her symptoms resolved after completing physical therapy.

---

[3] Ms. Salzwedel suffered from chronic conditions, which included fibromyalgia, generalized osteoarthritis, chronic pain syndrome, lower back pain and sciatica, and depression and anxiety. Her primary care physician treated these conditions. She was also under the care of a pain clinic.

She admitted that she takes ten milligrams of hydrocodone three times daily, but she denied taking it at work. The hydrocodone was prescribed for fibromyalgia pain. She denied that her fibromyalgia pain affects her neck, shoulder, or back, stating the pain was mostly muscular. She indicated she has bursitis in her hips that affected her low back. She had no permanent restrictions at the time of the CVS accident.

*Medical Treatment and Impairment*

For her CVS injury, Ms. Salzwedel received authorized medical treatment from Dr. Paul Brady and Dr. Timothy Renfree for her left elbow[4] and Dr. Patrick Bolt for her neck. At CVS's request, she underwent an independent medical evaluation (IME) with Dr. Thomas Koenig.

*Left Elbow*

Dr. Brady diagnosed left lateral epicondylitis and offered conservative treatment including physical therapy, injections, and bracing. Although he assigned no permanent impairment or restrictions, Dr. Brady noted that Ms. Salzwedel's conservative treatment failed to resolve her left elbow pain and sensitivity, and he recommended an open lateral epicondylar release. Because he did not perform that surgery, Dr. Brady referred Ms. Salzwedel to his colleague, Dr. Renfree. There is no evidence that Ms. Salzwedel underwent left elbow surgery.

*Neck*

Dr. Bolt treated Ms. Salzwedel for her neck with Dr. Bolt. He testified by deposition, stating, "I believe the fall in February of 2016 has contributed more than 50 percent to the development of her herniated discs [at C4-5 and C6-7] and resultant neck pain and left upper extremity radiculopathy." He referred her for physical therapy and discussed the possibility of an anterior cervical discectomy and fusion surgery, which she declined. He placed her at MMI on December 14, 2016, and assigned a permanent impairment rating.

Using Table 17-2 of the 6th edition of the American Medical Associations Guides to the Evaluation of Permanent Impairment (AMA Guides), Dr. Bolt placed Ms. Salzwedel in Class 3 for multiple level disc herniations with documented radiculopathy and assigned a 15% permanent medical impairment to the whole person. Dr. Bolt testified the presence of radiculopathy was a factor in his rating, stating, "This was a verifiable radiculopathy on multiple physical examinations by me over the course of treatment, and it consistently presented in a left C7 distribution, which was consistent with her most significant finding on imaging."

---

[4] The parties did not introduce Dr. Renfree's records or testimony.

To control her radicular pain caused by the work injury, Dr. Bolt recommended permanent restrictions: limited overhead work, limited outstretched arm use, no heavy gripping, no use of vibrating tools, limit push/pull to five pounds, no use of hazardous machinery, no lifting over five pounds frequently, no lifting over fifteen pounds maximum, limit stoop/bend/twist to four times per hour, and alternate sitting/standing to pain.

Dr. Bolt further signed a Physician Certification form that stated, "[D]ue to permanent restrictions on activity [Ms. Salzwedel] has suffered as a result of the injury, [she] no longer has the ability to perform [her] pre-injury occupation." Dr. Bolt admitted he did not know the accommodations made by CVS and agreed he did not believe Ms. Salzwedel could not return to work in any capacity.

Dr. Bolt indicated Ms. Salzwedel's need for future medical treatment was unclear. He stated she could continue to have significant symptoms and decide to have surgery, as further normal activities could cause her disc herniations to worsen the compressions on the nerves. However, he also noted her body might heal itself through calcification of the disc herniations reducing their size. Dr. Bolt last examined Ms. Salzwedel on January 23, 2017.

*IME*

At CVS's request, Dr. Koenig conducted an IME and diagnosed left elbow contusion with epicondylitis, left paracentral disc extrusion at C6-7 and possibly at C4-5, and non-verifiable left C7 radiculopathy. Dr. Koenig indicated Ms. Salzwedel reached MMI on or about January 23, 2017, and she sustained a permanent medical impairment. He stated, "Giving [Ms. Salzwedel] the maximum benefit of the doubt, and there is cause for some doubt, [she] received a 5 percent whole person impairment rating[.]" He based Ms. Salzwedel's impairment on Table 17-2 of the AMA Guides and utilized Class 1 for intervertebral disc herniation. Dr. Koenig admitted that verified radiculopathy could have changed his impairment rating but indicated his findings on examination and on review of the treating physicians' records did not support a diagnosis of verified radiculopathy.

Dr. Koenig testified, "[Ms. Salzwedel], with a high degree of medical certainty, had some pre-existing cervical disease that was either underdiagnosed or masked by her previous diagnosis of fibromyalgia." He pointed to diagnostic testing demonstrating a cervical bone spur, which could not have developed on the same day as the injury. He also identified multiple-level disc involvement typically seen in a global arthritis diagnosis rather than an acute injury. Dr. Koenig additionally reported Ms. Salzwedel exhibited symptom magnification based on differences between her statements and the objective findings of the examination and records. He placed permanent restrictions: no overhead work, no crawling, no work at heights greater than two feet, and a fifteen-pound lifting/carrying restriction in the left upper extremity.

4

*Vocational Disability*

Ms. Salzwedel worked at CVS following her work injury for ten months. She did not miss work except for doctor's appointments and earned the same wages as before her injury. She testified the store manager accommodated her restrictions and assigned her modified work, which included moving stock to the front of the shelf, sweeping the parking lot, and processing damaged stock. However, she reported she had to stoop to lift items from the floor and twist and bend to empty the dustpan. She agreed the store manager worked with her and asked her coworkers to assist her with lifting. The store manager also allowed her to work at waist height, but she indicated her coworkers did not want to assist. She admitted CVS knew of her restrictions and responded to any concerns she voiced regarding her job duties. She also admitted she drove herself to/from work after her injury.

Ms. Salzwedel however also testified she believed CVS assigned her duties outside her restrictions. On November 23, 2016, with her son's assistance, she emailed the CVS district manager to report that she was unable to do the assigned work and it exceeded her restrictions. She asked for other jobs within her restrictions. She testified that, in response, she was terminated. She stated CVS did not offer her any other jobs and told her to return after she underwent neck surgery. She last worked on December 3.

Ms. Salzwedel testified she continues to have problems in her neck, left arm, and left shoulder. She described pain in her neck, left elbow, and left shoulder and difficulty grasping with her left hand. She also indicated she cannot turn her head and experiences pain with swallowing. She reported she cannot sit or stand for eight hours, and she cannot alternate sitting and standing without pain. She testified she cannot do yardwork or major housework, nor can she play with her grandchildren. She can drive to her nearby church but cannot turn her neck to drive to town. She stated she is not aware of any work she can do. She admitted she did not elect to have neck surgery due to her fears and claustrophobia. She believed the surgery was elective without a guarantee of improvement of her symptoms. She further admitted she declined injections and did not complete physical therapy due to increased pain.

Concerning her vocational disability, Ms. Salzwedel hired Craig Colvin, Ed.D. His methodology involved conducting a situational assessment interview, reviewing medical records to identify medical restrictions, and considering the local labor market to determine the jobs unavailable to the injured employee. Dr. Colvin testified when he considered Dr. Bolt's and Dr. Koenig's similar restrictions, he determined Ms. Salzwedel sustained an 85-90% vocational disability. When he considered her permanent restrictions plus her pain adjustments, he concluded she was not realistically employable. He also indicated her restrictions prevented her from returning to her prior jobs on a sustained basis. CVS did not introduce countervailing testimony.

**Findings of Fact and Conclusions of Law**

Ms. Salzwedel has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions*, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2017).

*Permanent Medical Impairment and Permanent Restrictions*

The parties stipulated that Ms. Salzwedel sustained a work-related injury with CVS and received authorized medical treatment with Dr. Bolt. As the authorized treating physician, his opinion is presumed correct. To overcome the presumption, Dr. Koenig's opinion must rebut Dr. Bolt's opinion by a preponderance of the evidence. *See* Tenn. Code Ann. § 50-6-204(k)(7).

It is within the trial court's discretion to conclude that the opinion of one expert should be accepted over that of another expert as the more probable explanation. *Ledford v. Mid Georgia Courier, Inc.*, 2018 TN Wrk. Comp. App. Bd. LEXIS 28, at *7-8 (Jun. 4, 2018) (internal citations omitted). In evaluating expert medical opinions, the trial court may consider, among other things, the qualifications of the experts, the circumstances of their evaluation, the information available to them, and the evaluation of the importance of that information by other experts. *Id.*

Here, both physicians are board-certified orthopedic surgeons. Both had similar information available to them, similarly evaluated this information, and used the same table in the AMA Guides. The differences exist in the circumstances of their evaluation and the classification assigned under the Guides.

Dr. Bolt saw Ms. Salzwedel over the course of seven months and placed her in a higher impairment class based on his diagnosis of verified radiculopathy. He testified, "This was a verifiable radiculopathy on multiple physical examinations by me over the course of treatment, and it consistently present in a left C7 distribution, which was consistent with her most significant finding on imaging." In contrast, Dr. Koenig saw Ms. Salzwedel once and placed her in a lower class based on a finding of non-verifiable radiculopathy. Dr. Koenig testified his findings on examination and on review of the treating physicians' records did not support a diagnosis of verified radiculopathy.

The Court holds by a preponderance of the evidence that Dr. Koenig's opinion failed to rebut the presumption of correctness afforded Dr. Bolt. Accordingly, the Court concludes Ms. Salzwedel sustained a 15% permanent medical impairment.

6

*Permanent Vocational Disability*

Under the Workers' Compensation Law, there are four circumstances when permanent disability benefits are available to an injured employee who suffers an injury arising primarily out of and in the course and scope of employment. The first three circumstances involve awards of permanent partial disability benefits. The fourth circumstance involves an award of permanent total disability benefits.

In the first circumstance, an injured employee may recover the "original award," which is calculated by multiplying the permanent medical impairment rating by 450 weeks and then multiplying the result by the employee's weekly compensation rate. This is the employee's initial period of compensation; the period is determined by multiplying the rating by 450 weeks. *See Batey v. Deliver This, Inc.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 2, *7-8 (Feb. 6, 2018); *see also* Tenn. Code Ann. § 50-6-207(A).

In the second circumstance, the employee qualifies for an increased benefit equal to 1.35 times the original award when the initial compensation period ends and the injured employee has not returned to work for any employer earning at least the same rate of pay as before the injury. This is known as the "resulting award." The trial court can further increase this award if: (1) the employee lacks a high school diploma or general equivalency diploma (1.45 factor); (2) the employee is over forty years old when the initial compensation period ends (1.2 factor); or (3) the unemployment rate in the employee's Tennessee county of employment was at least two percentage points higher than the state's unemployment rate at the time the initial period of compensation ends (1.3 factor). These additional benefits are generally called "increased benefits," and the employer is entitled to a credit for the original award. *Id.* at *8-9; *see also* Tenn. Code Ann. § 50-6-207(3)(B).

In the third circumstance, the employee may receive benefits up to 275 weeks at the employee's weekly compensation rate if the employee qualifies for increased benefits, but the trial court finds the employee's case to be "extraordinary." These benefits are known as "extraordinary relief." To award extraordinary relief, the trial court must determine by clear and convincing evidence that limiting the employee's recovery to increased benefits would be inequitable in light of the totality of the circumstances and make specific, documented findings that: (1) the employee's medical impairment rating is at least 10%; (2) the authorized treating physician certified on a Bureau form that the employee no longer has the ability to perform the employee's pre-injury occupation due to permanent restrictions on activity caused by the work injury; and (3) the employee is earning less than 70% of the pre-injury average weekly wage or salary. *Id.*; *see also* Tenn. Code Ann. § 50-6-242(a).

Finally, an injured employee may be entitled to permanent total disability benefits if the trial court finds that the injury "totally incapacitates the employee from working at an

7

occupation that brings the employee an income." Permanent total disability benefits are paid at the employee's weekly compensation rate from the date of MMI until the date the employee qualifies for "full benefits in the Old Age Insurance Benefit Program under the Social Security Act." *Id.* at *9-10; *see also* Tenn. Code Ann. § 50-6-207(4).

Here, Ms. Salzwedel alleged she is entitled to permanent total disability benefits, or alternatively, she is entitled to extraordinary relief. CVS disagreed and argued Ms. Salzwedel is limited to her original award plus increased benefits.

In assessing whether Ms. Salzwedel is entitled to permanent total disability benefits, the Court may consider a number of factors to ascertain a complete picture of her ability to return to gainful employment. *See Duignan v. Stowers Mach. Corp.*, 2018 TN Wrk. Comp. App. Bd. LEXIS 25, at *10-11 (May 29, 2018) (internal citations omitted). These factors include her skills, education, age, training, and available job opportunities in her disabled condition. *Id.* The Court may consider Ms. Salzwedel's assessment of her overall physical condition, including her ability to return to gainful employment. *Id.*

Considering these factors, the Court finds it important that Ms. Salzwedel worked for ten months following her injury and drove herself to/from work, without missing work except for doctor's appointments. She admitted the store manager responded to any concerns she voiced regarding her job duties. While Ms. Salzwedel testified that she does not know of any job she could do, Dr. Bolt testified Ms. Salzwedel was not restricted completely from working. Vocational expert Dr. Colvin testified when he considered Dr. Bolt's and Dr. Koenig's similar restrictions, he determined Ms. Salzwedel sustained an 85-90% vocational disability. He testified she was realistically unemployable only when he considered her permanent restrictions plus her pain adjustments. For these reasons, the Court holds the evidence preponderates against an award of permanent total disability benefits.

Having denied an award of "permanent total disability" benefits, the Court must next determine the extent of Ms. Salzwedel's permanent partial disability. The Court holds she is entitled to an original award based upon a 15% permanent medical impairment rating. Her original award equates to 67.5 weeks from her date of MMI (December 14, 2016) at her workers' compensation rate of $274.47, or $18,526.73.

When her initial compensation period expired on April 3, 2018, Ms. Salzwedel had not return to work for any employer earning at least the same rate of pay as she earned before her injury. Her testimony is uncontroverted that CVS terminated her. The Court holds Ms. Salzwedel is entitled to increased benefits based on her inability to return to work (1.35), her education (1.45), and her age (1.2), which equates to 35.23% permanent partial disability or $43,519.29 less the original award, for an additional increased benefit of $24,992.56.

Since Ms. Salzwedel is entitled to increased benefits, the Court then must determine

8

whether she demonstrated by clear and convincing evidence that limiting her recovery to increased benefits would be inequitable in light of the totality of the circumstances. The Court finds at expiration of her initial compensation period: (1) she had a 15% permanent medical impairment, (2) her authorized treating physician certified on the Bureau's form that she no longer has the ability to perform her pre-injury occupation due to permanent restrictions caused by the work injury; and (3) she earned less than 70% of her pre-injury average weekly wage.

While Ms. Salzwedel did return to her pre-injury employment following her injury, she did so only in an accommodated position before reaching MMI. Her uncontroverted testimony showed it became difficult for her to continue working in the accommodated job, and she asked the district manager for other options, which CVS did not offer and instead terminated her. The Court finds a return to employment in an accommodated position before MMI does not equal an ability to *perform* the pre-injury occupation due to *permanent restrictions*. (Emphasis added).

Additionally, Dr. Colvin testified that when he considered Dr. Bolt's and Dr. Koenig's restrictions, he determined Ms. Salzwedel sustained an 85-90% vocational disability, and he indicated her restrictions prevent her from returning to her prior jobs on a sustained basis. In comparison, an award of extraordinary relief entitles an injured employee to up to 275 weeks of permanent partial disability benefits, which calculates to 61.11% permanent partial disability. This is significantly less than Dr. Colvin's assessment based on Ms. Salzwedel's permanent restrictions.

For these reasons, the Court holds the clear and convincing evidence demonstrates that limiting Ms. Salzwedel's recovery to increased benefits would be inequitable in light of the totality of the circumstances. Accordingly, the Court awards Ms. Salzwedel extraordinary relief" in the total amount of 275 weeks, or $75,479.25, plus lifetime medical benefits.

*Attorney Fees*

Finally, Ms. Salzwedel's counsel requested a 20% fee. Before the Court can award an attorney fee in excess of $10,000.00, Tennessee Code Annotated section 50-6-226(a)(2)(C) requires specific findings of the factors in Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5, which include:

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
2. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
3. The fee customarily charged in the locality for similar legal services.
4. The amount involved and the results obtained.

9

5. The time limitations imposed by the client or by the circumstances.
6. The nature and length of the professional relationship with the client.
7. The experience, reputation, and ability of the lawyer or lawyers performing the services.
8. Whether the fee is fixed or contingent.
9. Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
10. Whether the fee agreement is in writing.

The Court finds that this case required significant time and expertise by Ms. Salzwedel's counsel. A 20% fee is statutorily authorized and customary in cases brought before this Court. Further, the amount is appropriate, as this case was complicated, spanned more than a year of litigation, and required multiple experts. All the applicable factors, including the experience and ability of Ms. Salzwedel's attorney, support an award of the requested fee. Therefore, under Tennessee Code Annotated sections 50-6-207(4)(A)(ii)(a) and 50-6-207(4)(A)(iii), the Court commutes 20% of the permanent partial disability benefits for Ms. Salzwedel's attorney's fee in the amount of $15,095.85.

**IT IS, THEREFORE, ORDERED** as follows:

1. CVS and/or its carrier shall provide Ms. Salzwedel with medical treatment for her work injuries under Tennessee Code Annotated section 50-6-204. Dr. Bolt remains the authorized treating physician.

2. CVS and/or its carrier shall pay Ms. Salzwedel a permanent partial disability award of 275 weeks, or $75,479.25. Out of this award, Ms. Salzwedel's counsel shall be paid a 20% attorney fee, or $15,095.85, in a lump sum.

3. CVS shall prepare and file a statistical data form within ten business days of the date of this order.

4. The filing fee for this this case is taxed to CVS under Rule 0800-02-21-.07 of the Tennessee Compilation Rules and Regulations.

5. Absent an appeal of this order by either party, the order shall become final thirty days after issuance.

**ENTERED September 18, 2018.**

**PAMELA B. JOHNSON, JUDGE**
**Court of Workers' Compensation Claims**

10

# APPENDIX

Technical Record:

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Scheduling Hearing
4. Order, September 1, 2017
5. Order, September 11, 2017
6. Agreed Scheduling Order
7. Notice of Employee's Medical Experts
8. Employer's Notice of Medical Experts
9. Motion to Enforce Settlement Agreement or in the Alternative a Judgment Based upon the Pleadings
10. Subsequent Injury Fund's Response to Motion to Enforce Settlement Agreement or in the Alternative a Judgment Based upon the Pleadings
11. Employer's Response to Motion to Enforce Settlement Agreement or in the Alternative a Judgment Based upon the Pleadings.
12. Employee's Reply to Subsequent Injury Fund's Response to Motion to Enforce Settlement Agreement or in the Alternative a Judgment Based upon the Pleadings
13. Order Denying Motion to Enforce Settlement or in the Alternative a Judgment Based upon the Pleadings.
14. Agreed Order to Modify Agreed Scheduling Order
15. Notice of Compliance with Scheduling Order
16. Notice of Deposition
17. Notice of Rescheduled Deposition
18. Motion for Relief from Scheduling Order
19. Affidavit of Timothy Roberto
20. Employer's Response to Employee's Motion for Relief from Scheduling Order
21. Order Granting Relief from Scheduling Order
22. Notice of Deposition of Dr. Patrick Bolt
23. Notice of Supplemental Deposition of Employee
24. Amended Agreed Scheduling Hearing Order, April 30, 2018
25. Amended Agreed Scheduling Hearing Order, May 16, 2018
26. Agreed Order to Exceed Page Limitations
27. Compensation Hearing Stipulations
28. Employee's Notice of Filing of Exhibits for August 21, 2018 Compensation Hearing
29. Joint Pre-Hearing Statement
30. Employer's Compensation Hearing Brief
31. Notice of Voluntary Non-Suit and Order of Voluntary Non-Suit as to Defendant Subsequent Injury Fund Only

32. Employee's Pre-Compensation Hearing Brief
33. Employer Exhibit List
34. Notice of Filing Proof Deposition Transcript of Dr. Patrick Bolt for August 21, 2018 Compensation Hearing
35. Notice of Filing Deposition Transcript of Dr. Thomas Koenig
36. Notice of Filing Medical Records
37. Post ADR Dispute Certification Notice

The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

Exhibits:
1. Preliminary Report of Dr. Craig Colvin, February 17, 2018
2. Curriculum Vitae of Dr. Craig Colvin
3. Correspondence to Dr. Craig Colvin, March 8, 2018
4. Addendum Response of Dr. Craig Colvin, March 12, 2018
5. Ms. Salzwedel's email to CVS regarding work within restrictions
6. Deposition of Dr. Patrick Bolt
7. Deposition of Dr. Thomas Koenig
8. Medical Records Table of Contents
   a. Dr. David Cox, Summit Medical Group
   b. Dr. Paul Brady, Tennessee Orthopaedic Clinic
   c. Dr. Patrick Bolt, Tennessee Orthopaedic Clinic

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on September 18, 2018.

| Name | Certified Mail | Fax | Email | Service sent to: |
|---|---|---|---|---|
| Timothy Roberto, Employee's Attorney | | | X | troberto@brownandroberto.com |
| Ryan C. Edens Employer's Attorney | | | X | rcedens@mijs.com |

**PENNY SHRUM, COURT CLERK**
**wc.courtclerk@tn.gov**

12



**COMPENSATION HEARING NOTICE OF APPEAL**
Tennessee Division of Workers' Compensation
www.tn.gov/labor-wfd/wcomp.shtml
wc.courtclerk@tn.gov
1-800-332-2667

Docket #: _____

State File #/YR: _____

RFA #: _____

Date of Injury: _____

SSN: _____

_____

**Employee**

_____

**Employer and Carrier**

**Notice**

Notice is given that _____

[List name(s) of all appealing party(ies) on separate sheet if necessary]

appeals the order(s) of the Court of Workers' Compensation Claims at _____

_____to the Workers' Compensation Appeals Board.

[List the date(s) the order(s) was filed in the court clerk's office]

**Judge**_____

**Statement of the Issues**
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

**List of Parties**

**Appellant (Requesting Party):**_____At Hearing:☐Employer☐Employee

Address:_____

Party's Phone:_____Email:_____

Attorney's Name:_____ BPR#: _____

Attorney's Address:_____ Phone: _____

Attorney's City, State & Zip code:_____

Attorney's Email:_____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name:_____ SF#:_____ DOI:_____

## Appellee(s)
**Appellee (Opposing Party):**_____At Hearing:☐Employer☐Employee

Appellee's Address: _____

Appellee's Phone:_____Email:_____

Attorney's Name:_____ BPR#: _____

Attorney's Address:_____ Phone: _____

Attorney's City, State & Zip code: _____

Attorney's Email:_____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I,_____, certify that I have forwarded a true and exact copy of this Compensation Hearing Notice of Appeal by First Class, United States Mail, postage prepaid, to all parties and/or their attorneys in this case in accordance with Rule 0800-02-22.01(2) of the Tennessee Rules of Board of Workers' Compensation Appeals on this the_____day of_____, 20__.

[Signature of appellant or attorney for appellant]         _____

Attention: This form should only be used when filing an appeal to the Workers' Compensation Appeals Board. If you wish to appeal a case to the Tennessee Supreme Court, please utilize the form provided by the Court which can be found on their website at the following address:
http://www.tncourts.gov/sites/default/files/docs/notice_of_appeal_-_civil_or_criminal.pdf



<u>Compensation Hearing Order Right to Appeal</u>:

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____   Relationship: _____

_____   Relationship: _____

_____   Relationship: _____

_____   Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning _____ |
| SSI | $ _____ per month | beginning _____ |
| Retirement | $ _____ per month | beginning _____ |
| Disability | $ _____ per month | beginning _____ |
| Unemployment | $ _____ per month | beginning _____ |
| Worker's Comp. | $ _____ per month | beginning _____ |
| Other | $ _____ per month | beginning _____ |

9. My expenses are:

Rent/House Payment $ _____ per month     Medical/Dental   $ _____ per month

| Groceries | $ _____ per month | Telephone | $ _____ per month |
| Electricity | $ _____ per month | School Supplies $ _____ per month |
| Water | $ _____ per month | Clothing | $ _____ per month |
| Gas | $ _____ per month | Child Care | $ _____ per month |
| Transportation | $ _____ per month | Child Support | $ _____ per month |
| Car | $_____ per month | | |
| Other | $ _____ per month (describe: _____ ) | | |

10. Assets:

Automobile      $ _____      (FMV) _____

Checking/Savings Acct. $ _____

House      $ _____      (FMV) _____

Other      $ _____      Describe:_____

11. My debts are:

Amount Owed             To Whom

_____     _____

_____     _____

_____     _____

_____     _____

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____

APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____

NOTARY PUBLIC

My Commission Expires:_____

LB-1108 (REV 11/15)                                RDA 11082